IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | CR. No. 2:12-119 |
| | ) | |
| | ) | |
| TAMEKO FISHBURNE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ON BEHALF OF TAMEKO FISHBURNE**

**IN AID OF SENTENCING**

BARNWELL WHALEY PATTERSON & HELMS, LLC

By: /s Craig Edmond Burgess            .
Craig E. Burgess
cburgess@barnwell-whaley.com
885 Island Park Drive (29492)
PO Drawer H
Charleston, South Carolina 29402
(843) 577-7700

*ATTORNEYS FOR TAMEKO FISHBURNE*

October 11, 2012

Charleston, South Carolina

**I.**

**INTRODUCTION**

This sentencing memorandum and accompanying information is submitted to this Court to assist in the sentencing of Tameko Fishburne, who previously pled guilty on to one count of Conspiracy to Commit Mail Fraud, Wire Fraud and Financial Aid Fraud in violation of 18 U.S.C. § 371, which arose out of a scheme to profit from fraudulently procured federal student loans. Shortly after she was indicted, Tameko Fishburne lost her job as a Medical Assistant at Allendale Correctional Institution and was dismissed from South University's nursing program, a mere 6 months before obtaining her degree.

Tameko Fishburne's participation in this conspiracy represents a shocking departure from the straight-laced life she led for the first 29 years of her life. After having finally landed a steady and reliable job at Allendale Correctional and on the brink of achieving perhaps the most significant accomplishment of her life (other than the birth of her son Antawn Griffin), by graduating from South University and obtaining a nursing degree, Tameko now finds herself in a situation completely of her own doing, her once promising career and the future hope of a stable and comfortable family life for Antawn and her in tatters. What is perhaps most frustrating for Tameko is the sheer naivety that colored her actions, the unconditional trust that she put in others, and the wrongheaded belief at first that her actions were somehow benign. But that naivety is gone now, replaced with the overwhelming realization that her conduct was inexcusable and unlawful, that she was indeed part of a scheme that defrauded the federal government, and that she is solely responsible for her own actions and that, in the end,

the fact that she may have been led astray by others for whom she trusted does not excuse her behavior one iota.

Having come to these hard and incontrovertible truths about herself and her conduct, Tameko stands ready to accept her punishment. But she is also ready to put her life back in order. The road that she once travelled is still there and she wants to find her way back to it, back to familiar terrain, the terrain of I-95 and Hwy. 26 that she used to drive on her way from Walterboro to Columbia to attend nursing school at South University, four (4) days a week, Monday through Thursday, and then back down those same highways, back to Walterboro, to her son Antawn, all of 9 years old, and to her former job at Allendale Correctional Institution, three days a week, from Friday to Sunday, where she would work for 12-1/2 hours a day, studying on breaks, and then back on the road to Columbia early Monday morning, her body weary from lack of sleep, to start the process over again. Although the job at Allendale Correctional is forever lost, the possibility of her re-enrollment at South University and the goal of becoming a nurse is not. She knows now that there are no guarantees, that getting back in school is not guaranteed, but she craves for the chance to meet that challenge, the chance to start anew, to return to some semblance of the life that she once had, the life she took for granted—a life of work, going to school, and being a mother.

With the loss of her job, the ability, at least temporarily, to pursue her education, and the respect of others that she admires, Tameko Fishburne has already suffered greatly. The felony conviction will no doubt make it more difficult to reach her goals to be sure, but she is more motivated now than ever before to right herself. As

this Court weighs enumerable factors in determining Tameko Fishburne's sentence, we ask the Court to take into account not just the Tameko Fishburne who acted badly, but the person she was leading up to her disastrous decisions. We beg the Court to let Tameko Fishburne get back to the road she once travelled, without incarceration, and instead sentence her to a period of probation, which for her and her son Antawn, will make "all the difference."[1]

## II.

## BACKGROUND OF TAMEKO FISHBURNE

Tameko Fishburne was born on December 19, 1982 in Walterboro, South Carolina. She was raised by her mother, co-defendant, Lena Gant, a single mother who struggled financially to raise Tameko and her other two daughters, Marquita and Shannon, who are also co-defendants. Things improved for the family when Ms. Gant married Ron Gant but after he suffered a stroke and was unable to work, the hardships returned. Tameko and her siblings found themselves moving from place to place, sometimes without lights to do their homework and not enough food to keep their bellies full. Perhaps more than her siblings, Tameko's upbringing took a toll on her self-esteem. She grew up scared, hesitant, afraid to try new things—not surprising, considering she was relentlessly teased about the clothes she wore, her looks and the thick-rimmed glasses she donned as a child.

For as long as she could remember, Tameko had always been drawn to helping and caring about others. She thought about becoming a nurse, but she was so lacking in

---

[1] From *The Road Not Taken* by Robert Frost

confidence by the time she graduated from high school that she forego enrolling in college, believing she was either incapable or unworthy of making a better life for herself.  And so, she took baby steps.  Beginning when she was 16, she worked seasonal jobs as a housekeeper during the summers in Hilton Head until she was 27; she worked as a waitress at the Ramada Inn Hotel from 2000-2001, unknowingly building self-confidence in herself through the constant interactions with customers.  In early 2003, she learned she was pregnant and the realization that she needed something more substantial so that she could take care of the baby growing inside her led her to begin taking classes to become a Certified Nursing Assistant, which she obtained in September 2003, and also working in the Bayview nursing home in Beaufort for two years in 2003-04.  Following that, she was a Medical Technician and Activity Assistant at Colleton Place, an Assisted Living Facility, in Walterboro from 2004-05.  From there, she enrolled at Beta Tech and received a Certificate as a Medical Assistant in 2006 and was officially certified for that position in 2007, all the while working as a Customer Service Representative for Dial America.

Armed with her certification, Tameko landed a job in March 2007 at Allendale Correctional Institution as a Medical Assistant, a job she thoroughly enjoyed.  She was no longer the shy, unassuming girl that graduated from high school years before.  She had friends, a smart, well-adjusted son, and now, a job she was proud of.  For the first time, she beamed with confidence, the dream of becoming a nurse still simmering deep within her even after all those years had passed.  But, she always knew she couldn't just walk away from gig at Allendale Correctional; it was a good job, a steady paycheck with

benefits that she needed to raise her son, Antawn, who by the time she got the job, was 4 years old. Somehow, somewhere, she heard about South University's nursing program and inquired about enrolling. The school told her she needed a number of prerequisites before she could even get into the program, yet that did not dissuade her. She buckled down and signed up for the necessary courses beginning in 2010, which she passed, and enrolled in the school's accelerated nursing program with a projected graduated date of December 2012.

On the way toward reaching her goals, Tameko, who regularly attends church,[2] made friends and touched the lives of people she came into contact with. One of those individuals is Verlynda Henderson, a friend and co-worker at Allendale Correction for the last five years. She is especially grateful for having Tameko in her life. As she sets forth in her statement:

> On a personal level she has extended her kindness beyond friendship in which one can say as a family member. She has kept my insulin depended brittle diabetic grandchild in which there was no fear in leaving her within the care of Ms. Fishburne. With her being a nursing student striving for excellency, and I knew she was in the best of care.
>
> In conclusion, I have never witness or had to endured any type of outburst of anger from Ms. Fishburne, but only an outburst of laughter or smile. Within any circle of my life, I would love for her to be with that arena because of her kindness and loveable personality.[3]

---

[2] Exhibit 1, Statement of Minister Evella Roberts. All of the Statements quoted herein have been typed exactly as written.
[3] Exhibit 2.

Another co-worker from Allendale Correctional, James Rumph, similarly has fond memories of Tameko.

> I met Ms. Fishburne in the Summer of 07. I found her to be of great character. I told her for young lady to be attending school full time and to be a single parent and work at a prison it takes a lot of patients and courage and I could see that in her. She had goals and was working toward them. She was to graduate in Dec. 2012 and she was really looking forward to that that and spending time with her son.[4]

Of course, Tameko knew it wouldn't be easy. The nursing program was in Columbia, South Carolina, and she would be required to attend school four days a week, Monday through Thursday, and at the same time, hold down her job at Allendale Correctional, for the remaining three days, Friday through Sunday, 12.5 hours per day. To do this meant that she would have to sacrifice time with Antawn and spend countless hours on the road, driving back and forth from Walterboro to Columbia to Fairfax. But, at no time did Tameko ever believe that it was not worth it. She was well on the way to reaching her dream and nothing was going to stop her.

And that is when it all fell apart.

For reasons still not entirely clear to her, Tameko passed on information from several of her co-workers to her mother, Lena Gant, so that they could scam the federal government. She didn't set out to recruit these individuals. It started innocently enough: a casual conversation with Mayella Saxon about Ms. Saxon's financial woes and before the blink an eye, Tameko found herself passing along that co-worker's name and other information to her mom. Other co-workers were interested as well and in the

---

[4] Exhibit 3.

end, Tameko has admitted without hesitation that she passed the identifying information of Mayella Saxon, Helen Ross, Betty Kinard and Theresa Loadholt, knowing that they had no intent to enroll in the online universities as legitimate students.

The repercussions of her actions were swift. She lost her job at Allendale Correctional and, of course, the benefits that came with it; her car was repossessed because she could no longer make the payments, and then, on June 7, 2012, she was dismissed from South University's nursing program, a mere six months from graduating.

More than anything, Tameko desires to put her life back on track. It is something that the people who have known her for a long time knows that she can do. A longtime friend and spiritual mentor, Evangelist Iris E. Spells, had this to say about her:

> [I]' ve known Tameko Fishburne over the past 23 years which is most of her life. She has been a very respectful young lady. In all the years of knowing her, I can honestly say she has never been disrespectful toward me or anyone else in my presence. I'm very proud that in spite of her having a child at a very early age, she still pursued her dream of becoming a nurse. She stayed focused maintained a job, and kept her grades up in school while on her way to becoming a nurse. I hope the court will take all this in consideration while making the decision about her future. . . I really don't think there would be a great benefit in sending her to prison. I hope you will give her the opportunity to try and make right her wrong and allow her to continue to be there for her son. So that she can continue to provide a loving home environment for him. Please I pray that you also consider him when making your decision.[5]

---

[5] Exhibit 4

Of course, Tameko is most worried for her son, Antawn. To say the least, the threat of his mother's possible incarceration, like any child, is utterly frightening to him. As Antawn put it in his letter to the Court:

> My mom means a lot to me. I love her very much also if it had not been for her I wouldn't be getting good grades in school and making superintendent list. My mom always buy me things and takes good care of me when I'm sick. I hope my mom doesn't get taken away from me because I would be very very sad and I would cry a lot. I probably make bad grades and not pass fourth grade. I wouldn't get help with my math also. I will always love her no matter what because she's my mom.[6]

Although Antawn's father has not been completely absent from his life, Tameko has been his primary caregiver. However, without the benefit of any financial support from Antawn's father, she has had to carry the lion's share of the burden of raising him. As argued below, Tameko is hopeful that the Court sees fit to sentence her to a period of probation so that she can begin to put her life back in order by finding a steady job once again and re-enrolling in the nursing program at South University.

### III.

### Tameko Fishburne Requests A Sentence of Probation
### Under U.S.S.G. § 5B1.1(a)(2) of the Sentencing Guidelines

Tameko Fishburne agrees with the PSR that pursuant to her Guilty Plea, her Total Offense Level is 10 and that the guidelines call for a term of imprisonment between 6 and 12 months under Zone B. Because the applicable guideline range is in Zone B, this Court can impose a sentence of probation pursuant to U.S.S.G. § 5B1.1(a)(2)[7] without

---

[6] Exhibit 5.
[7] See PSR, p. 21 ¶ 111.

the necessity of a downward variance. Accordingly, Fishburne respectfully requests that this Court impose a sentence of probation along with any further conditions, such as a fine, restitution, or community service, that the Court deems just and proper. The basis for Fishburne's request that she be sentenced to probation under U.S.S.G. § 5B1.1(a)(2) instead of the guidelines-recommended punishment of 6 to 12 months of incarceration is the same as the arguments that she makes below in support of her request for a downward variance pursuant to the § 3553(a) factors, and thus, incorporates those arguments by reference in her request that she be sentenced to probation under § 5B1.1(a)(2).

## IV.

### Tameko Fishburne Requests A Sentence of Probation Under Section 3553(a) of the Sentencing Guidelines

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that that all of the sentencing factors under 18 U.S.C. §3553(a)(1)-(7) must be considered without giving mandatory weight to the sentencing guidelines under 18 U.S.C. §3553(a)(4). Indeed, the overriding principle that will guide this Court in the sentencing of Tameko Fishburne is embodied in 18 U.S.C. §3553(a), which provides that the sentencing court "shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in [Section 3553] paragraph (2)."

To arrive at a sentence that is "sufficient but not greater than necessary," this Court must take into account certain factors outlined in Section 3553(a)(1)-(7), as follows:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, deterrence, protection of the public from the defendant;

(3) the kinds of sentences available ;

(4) the advisory guideline range;

(5) any pertinent policy statement issued by the Sentencing Commission;

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

(7) The need to provide restitution to any victims of the offense.

The ranges set forth in the advisory guidelines are but one of the §3553(a) factors that this Court must consider in determining a sentence that is "sufficient, but not greater than necessary" to meet the sentencing goals. In fact, no special weight is to be given to the advisory guidelines as opposed to the other factors mentioned in 18 U.S.C. §3553(a). *See Rita v. U.S.*, 127 S.Ct. 2456 (2007) (a sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply). *See also, U.S. v. Biheiri*, 356 F.Supp.2d 589, 594 (E.D.Va. 2005) (no individual factor is singled out as having greater weight; instead, the richness of factual diversity in cases calls on sentencing judges to consider all of the factors and to accord each factor the weight it deserves under the circumstances); *U.S. v. White*, 506 F.3d 634 (8th Cir. 2007) ("Under the post-*Booker* advisory guideline regime, district courts are not only permitted, but required, to consider 'the history and characteristics of the defendant.'").

Taking into account the § 3553(a) factors outlined above, Fishburne respectfully requests this Court to grant her request for a downward variance to Zone A, which provides for a guidelines recommended range of 0 to 6 months, and that after having done so, sentence her to a term of probation with any conditions the Court deems just and proper.

**A. Section 3553(a) factors, particularly "the nature and circumstances of the offense and the history and characteristics of the defendant" strongly suggest that a sentence of probation would be "sufficient, but not greater than necessary" to comply with the purposes of the Sentencing Guidelines.**

Tameko Fishburne pled guilty to the offense of Conspiracy to Commit Mail Fraud, Wire Fraud and Financial Aid Fraud in violation of 18 U.S.C. § 371, part of which was that the loss attributable to her actions amounted to $63,860.00. Although Fishburne herself received federal funds directly for enrolling in a class she did not attend,[8] most of the monetary loss attributable to her conduct relates to monies received by her fellow co-workers at Allendale Correctional.[9] The PSR sets forth that Tameko "recruited employees of the Allendale Correctional Facility . . . to participate in the scheme."[10] While Fishburne does not intend to draw too fine a distinction on the PSR's choice of words regarding her actions, i.e., "recruited,"[11] it may be worth pointing out to the Court that the PSR does not support the conclusion that Fishburne had no

---

[8] PSR, p. 8 ¶ 25.
[9] *Id.*
[10] *Id*. at p.5 ¶ 11.
[11] This may be a case of "six of one, half dozen of the other," an expression meaning that there is no important difference between alternatives.

specific intent to "recruit" her fellow employees, as that term naturally implies.[12] In the PSR, Fishburne merely stated that she "*passed*" the "personal identifying information of Saxon, Ross, Kinard and Loadholt "to Gant at these individuals' request"[13] and received "3 payments of $50 for her efforts in *passing this information*." (emphasis added). Nowhere in the PSR did Fishburne specifically characterize her behavior as the "recruit[ment]" of individuals to take part in the scheme. As for the people whose information she passed on to Ms. Gant, the PSR set forth that "[Betty] Kinard stated that she overheard Fishburne talking to Helen Ross and Mayella Saxon about the online school,"[14] so its seems apparent that Tameko did not initiate that particular contact. The PSR further sets forth that Helen Ross, Mayella Saxon and Theresa Loadholt each "*learned about* the online classes through . . . Tameko,"[15] (emphasis added), not that she originally engaged them in conversation about the plan without any expression of interest from them. By pointing out these subtle distinctions, Tameko is in no way attempting to negate her responsibility for her actions; rather, she seeks to provide this Court with as much clarity as possible as to what she specifically did. Tameko did not set out on the relevant days in question to specifically find individuals to participate in the scheme though she admittedly explained the details of it to her co-workers when they expressed an interest and subsequently passed their information onto her mother. Again, for this Court's purposes, this may be a distinction without a difference, but it is a

---

[12] "Recruit" is defined as "to *seek* to enroll <recruit prospective students>." *See* http://www.merriam-webster.com/dictionary/recruit (emphasis added).
[13] PSR, p. 8 ¶ 25.
[14] *Id.*, p. 15 ¶ 65.
[15] *Id.*, p. 15-16 ¶ 67-69.

distinction nonetheless, one that the Court should be aware of in its assessment of the "nature and circumstances of the offense" under the first of the § 3553(a) factors.

So too should this Court be aware of the pecuniary loss sustained. The amount of the loss attributable to Tameko was stipulated as $63,860 in the Guilty Plea. If "loss" is defined by the monies she and her fellow co-workers at Allendale Correction specifically received or was sent to the University of Phoenix on their behalf, the actual loss attributable to Tameko's conduct, is somewhat less than that, as noted by the chart below, which was taken from a document provided by the Government detailing the losses related to the subject fraud:[16]

|   | Total Amount of Loans Received | Total Amount of Pell Received | Total Finaid Posted To Student Account | Total Refunds Sent to Student | Total Finaid Returned to Lender | Amount Owed To Federal Programs | UOPX Balance | Total Restitution Owed to UOPX |
|---|---|---|---|---|---|---|---|---|
| TF | 4,702.50 | 2,366.00 | 7,068.50 | 4,988.50 | 3,298.88 | 3,769.62 | 2,440.88 | 6,210.50 |
| BK | 4,678.75 | 2,675.00 | 7,353.75 | 2,933.75 | 2,210.00 | 5,143.75 | --- | 5,143.75 |
| TL | 4,678.75 | 2,675.00 | 7,353.75 | 2,933.75 | 3,182.00 | 4,171.75 | 972.00 | 5,143.75 |
| HR | 4,678.75 | 2,366.00 | 7,044.75 | 4,964.75 | 2,729.00 | 4,315.75 | 2,664.00 | 6,979.75 |
| MS | 4,655.00 | 2,366.00 | 7,021.00 | 2,861.00 | 3,764.80 | 3,256.20 | --- | 3,256.20 |
| **Totals** | $23,393.75 | $12,448.00 | **$35,841.00** | $18,681.00 | $15,184.68 | $20,656.87 | $6,076.88 | $23,477.75[17] |

The third column reflects the maximum loss attributable to Tameko and the four individuals she passed information about to her mom, Lena Gant, as that number reflects the "Total Amount Of Loans Received" plus The "Total Amount Of Pell Received." In total, the amount of the loss attributable to Tameko Fishburne and her

---
[16] Exhibit 6.
[17] These numbers are taken from Exhibit 16 document itemizing losses. The two letter designation at the beginning of each row of the chart are the abbreviations from Tameko Fishburne, Betty Kinard, Theresa Loadholt, Helen Ross and Mayella Saxon, respectively.

four co-workers, **_appears to be $35,841.00_**.[18] In addition, although not entirely clear based on the headings used by the Government to describe the financial aid disbursements and losses, at least $15,184 of the fraudulently procured loan proceeds were returned to the lenders.[19]

The purpose of drawing the Court's attention to these facts is only to put in context the extent Tameko's actions. Yes, she was involved in the fraud, even to the point of obtaining funds directly, but she was not the conductor or orchestrator of the fraudulent scheme. That role belonged to others who engaged in multiple acts of deceit by acting as straw students, submitting the paperwork to procure the loans on behalf of others,[20] completing the classes that the straw students had been enrolled in,[21] identify theft,[22] and the forging of financial instruments.[23]

Tameko's limited role had everything to do with the fact that she was much more focused on her work, her school and her son, Antawn. While some of the other co-defendants seemingly had an endless amount of time to devote to the scheme, the path that Tameko was on did not afford her such an opportunity. She was focused on bettering her life, even as the unlawful events swirled around in her midst.

Prior to the events leading up to her indictment, Tameko had never been in trouble with the law, unlike her siblings, Marquita and Shannon Fishburne. It is

---

[18] In retrospect, defense counsel should have challenged the $63,860 number as part of the review and response to the PSR to avoid confusion at this stage. However, for purposes of calculating the increase in levels for the amount of the loss under § 2B1.1(b)(1)(D), six (6) levels would have still been added because the loss was more than $30,000.
[19] *Id.*
[20] *See generally, PSR ¶ 10-15*
[21] *Id.*
[22] *PSR, p. 6-7 ¶ 13-21.*
[23] *Id.*

impossible to know what would have happened had Tameko not lived with her mother and sisters when these events occurred, but that would have proved an almost impossible feat in light of her full-time job, being a full-time student, and a son to take care of. Undoubtedly, Tameko has the character and the characteristics to move beyond her current circumstances. She has the intelligence and particularly the drive to overcome this situation. As indicated in the attached letters, she has a support network to provide her with needed guidance as she navigates the unfamiliar terrain of dealing with a conviction.

In assessing whether a downward variance should be granted, the fact that to do so would not require a significant downward departure should be taken into account by this Court. *See United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ("In the event the sentencing court decides to impose a variance sentence, *i.e.*, one outside of the recommended Guidelines range, the sentencing court 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.' As noted by the *Gall [v. United States*, 552 U.S. 38 (2007)] Court, *it is an 'uncontroversial' proposition that a 'major departure should be supported by a more significant justification than a minor one*.'") (emphasis added). Although this Court already has the power to sentence Tameko to probation under U.S.S.G. § 5B1.1(a)(2) without having to rely upon a downward variance by taking into account the § 3553(a) factors, the fact that Tameko is right on the cusp of a recommended guideline range of 0-6 months under Zone A of the Sentencing Guidelines is hopefully instructive to the Court. The positive arc of the life she led up to the unfortunate criminal acts she

took part in, and the fact that she has a son for whom she has primary custody of without financial support from the father, militates in favor of granting her probation.

  B. **Remaining Section 3553(a) factors strongly suggest a sentence of probation would be "sufficient, but not greater than necessary" to comply with the purposes of the Sentencing Guidelines**

Defendant Fishburne similarly contends that the Court's application of the remaining § 3553(a) factors strongly suggest that a sentence of probation would be sufficient. Such a sentence, along with other conditions that the Court deems just and proper, such as restitution, will send a strong signal to others than the type of conduct engaged in by Tameko will not be dealt with lightly. Certainly, Tameko will be deterred from engaging in such conduct again.

Perhaps most significantly with respect to these remaining factors, a sentence of probation will allow Tameko to immediately begin pursuing the possibility of re-enrolling in the nursing program at South University. *See* § 3553(a)(3) ("to provide the defendant with needed educational or vocational training . . ."). A criminal conviction does not automatically bar an individual from becoming licensed in South Carolina. *See Nurse Practice Act*, § 40-33-140 ("As provided for in Section 40-1-140,[24] a license may not be denied based solely on a person's prior criminal record."). South University has a re-instatement policy for students who have been dismissed[25] but neither the Nursing Student Handbook nor the South University Student Handbook address possible

---

[24] "A person may not be refused an authorization to practice, pursue, or engage in a regulated profession or occupation solely because of a prior criminal conviction unless the criminal conviction directly relates to the profession or occupation for which the authorization to practice is sought. However, a board may refuse an authorization to practice if, based upon all information available, including the applicant's record of prior convictions, it finds that the applicant is unfit or unsuited to engage in the profession or occupation."

[25] Exhibit 7.

reinstatement of students who have been dismissed because of a pending criminal charge.[26] Because South Carolina law would not automatically bar Tameko from becoming licensed as a nurse based solely on a prior criminal conviction, it is reasonable to assume that South University would, consistent with the policy behind § 40-33-140, likewise not automatically bar Tameko from being readmitted because of her criminal conviction, which is consistent with the school's policy that a "Conviction of, plea of guilty, plea of nolo contendere (no contest), or pending criminal charges involving the following ***may*** bar admission to and may be grounds for dismissal from a clinical course of study."[27] (emphasis added).

Like any institution faced with assessing the merits of an applicant with a criminal conviction, one would expect South University to assess the totality of Tameko's life, education and work history upon receiving her application for reinstatement. Certainly, a sentence of confinement as opposed to a sentence of probation would probably make it less likely that she would be readmitted to the nursing program. A sentence of probation, thusly, would promote § 3553(a)(3) by making it more likely that Tameko is "provide[d] with needed educational . . . training."

## CONCLUSION

Tameko Fishburne made a terrible mistake. She made poor choices when she allowed herself to become involved in the scheme to defraud the federal government. However, those unfortunate choices were completely uncharacteristic of the way she led her life up to that point. Everything about her, the dedication to her education, her

---

[26] *Id*.
[27] Exhibit 8.

commitment to work, and her devotion to her son, Antawn, clearly demonstrate that her conduct was a gross anomaly. Accordingly, Tameko Fishburne asks this Court to sentence her to a term of probation with any further conditions that the Court deems just and proper. The Court can impose a sentence of probation without the necessity of a downward variance pursuant to U.S.S.G. § 5B1.1(a)(2). Alternatively, Tameko Fishburne requests a sentence of probation based on the factors set for under § 3553(a) as "sufficient, but not greater than necessary" to comply with the Sentencing Guidelines.

BARNWELL WHALEY PATTERSON & HELMS, LLC

By: /s Craig Edmond Burgess  .
Craig E. Burgess
cburgess@barnwell-whaley.com
885 Island Park Drive (29492)
PO Drawer H
Charleston, South Carolina 29402
(843) 577-7700

*ATTORNEYS FOR TAMEKO FISHBURNE*

October 11, 2012

Charleston, South Carolina